639 So.2d 951 (1993)
Ex parte Michael J. LACY.
(Re Michael Jerome Lacy v. State).
1920884.
Supreme Court of Alabama.
September 17, 1993.
Rehearing Denied November 5, 1993.
*952 Elissa H. Green, Huntsville, for petitioner.
James H. Evans, Atty. Gen., and Frances H. Smith, Asst. Atty. Gen., for respondent.
PER CURIAM.
The defendant, Michael Jerome Lacy, appealed his convictions for assault in the second degree, first degree burglary, and attempted rape in the second degree to the Court of Criminal Appeals. That court affirmed Lacy's convictions, by an unpublished memorandum. 618 So.2d 149 (Ala.Cr.App. 1993). We granted Lacy's petition for a certiorari review.
The dispositive issue is whether the trial court reversibly erred in allowing direct examination testimony as to specific acts purportedly engaged in by Lacy, that were not a part of the alleged crimes, to impeach Lacy's testimony.
An intruder attacked a 12-year-old girl on June 3, 1990, at 4:00 a.m., in Huntsville. The victim was in the home of her aunt and uncle. A police investigation at the scene indicated that the intruder had entered the dwelling through a dining room window. The victim described the intruder to police as a black male, but she stated that she did not see his face.
A few days after the incident, a police investigator learned that a black male census worker had been seen in the area during the week of the attack. The investigator obtained a photograph of the census worker, the defendant Michael Lacy, and used it in a "photographic line-up" held at the victim's home on June 13, 1990. The victim did not identify any photograph as that of the intruder. Later the same day, the investigator returned to the victim's home and again displayed the same photographs for her. This time the victim identified the photograph of the census worker, Lacy, as that of the intruder.
Subsequently, police conducted a physical line-up that included Lacy as subject "number three." The investigator present during this line-up testified that she did not hear the victim identify anyone from the line-up as the intruder, and a police report indicates that no subject was chosen by the victim. The victim's mother testified, however, that during the line-up the victim had stated that "number two" and "number five" looked like the intruder. According to the victim's mother, *953 after the line-up the victim stated to her that she had "picked the wrong one," and that "number three" looked like the intruder.
Although the victim had previously denied having seen the intruder's face during the attack, she stated at trial that she had experienced flashbacks that enabled her to identify the intruder. At trial she identified Lacy as the intruder.
Lacy denied any participation in the alleged crimes and consented to hair, blood, and saliva sampling. Also, his home was searched. No physical evidence was discovered linking him to the crime. The evidence produced against Lacy at trial was the testimony of the victim and evidence that Lacy had been in the area of the incident on the day of the attack.
Also, over Lacy's objections, the court allowed the state to present the testimony of two witnesses who each testified about incidents occurring after the attack. One witness, who lived near Michael Lacy, stated that she had once been told by a neighbor that someone identified as "Mike" had either looked in, or had tapped on, her window late at night. The other witness testified that she had seen Lacy looking in her window late one night. This testimony was offered by the state purportedly to impeach cross-examination testimony by Lacy that he had "no reason to" look "through other people's windows," and had not hidden in the bushes outside the house the victim had been in on the night of the attack.
During the first 10 hours of the jury's deliberations, the jury foreman twice informed the court that the jury was deadlocked, and the court encouraged it to continue deliberating. After another day of deliberation, the jury found Lacy guilty of assault in the second degree, burglary in the first degree, and attempted rape in the second degree.
At issue, as indicated, is whether the trial court erred in allowing the testimony of the two witnesses as to acts allegedly occurring after the incident in question. The trial court ruled that this testimony was about acts by Lacy that were inconsistent with his testimony as to material matters (whether he had reason to look in windows or had hidden in the bushes where the victim was staying), and was therefore admissible to impeach his testimony. The trial court allowed the "impeachment" testimony with the following limitation to the jury: "This testimony [from the two `impeachment' witnesses] is admissible for one purpose and one purpose only, and that is, if believed by you, to be used by you ... to decide the credibility or believability that you choose to give [the defendant's] testimony, and then the weight that you should give to that testimony."
We agree with the trial court that "[a]n act of a witness which is inconsistent with his present testimony about a material matter is a self-contradiction and, as such, is provable for purposes of impeachment," C. Gamble, McElroy's Alabama Evidence, § 155.02(3) (4th ed. 1991), but we do not agree that that rule applies here, owing in part to a lack of materiality[1] and in part to a lack of inconsistency. The testimony by Lacy that he "had no reason to" look in windows was immaterial to the issues at trial, and there was no inconsistency between the "impeachment" witnesses' testimony and Lacy's testimony that he did not hide in the bushes on the evening in question. The "impeachment" testimony was in no way directed toward whether Lacy had hidden in bushes where the victim was staying, at the witnesses' homes, or elsewhere. Also, while there was evidence that there was a hedge near the window the intruder entered, there was no evidence that the intruder hid in the hedge either before or after the attack.[2]
Also, although whether Lacy had tapped on a witness's window late at night or had *954 looked in a witness's window late at night, would be relevant to whether Lacy had some propensity for "bad acts," "[t]hat such evidence may have some probative value does not in and of itself entitle it to admission." Christian v. City of Tuscaloosa, 53 Ala.App. 81, 297 So.2d 405 (1974).
"`The state may not show [the] defendant's prior trouble with the law, specific criminal acts, or ill name among his neighbors, even though such facts might logically be persuasive that he is by propensity a probable perpetrator of the crime. The inquiry is not rejected because character is irrelevant; on the contrary, it is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge. The overriding policy of excluding such evidence, despite its admitted probative value, is the practical experience that its disallowance tends to prevent confusion of issues, unfair surprise and undue prejudice.'"
Id., 53 Ala.App. at 85, 297 So.2d at 408, quoting Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168 (1948).
The corollary to the rule that an accused cannot show prior good acts to prove that he or she did not commit the crime for which he or she is charged, is that the state cannot prove the defendant's alleged criminal conduct at the time in question by evidence of how the defendant behaved on another occasion. See McElroy's, § 26.01(1). "One of the cardinal principles of the common law is that a person's character, good or bad, offered for the purpose of showing his conduct on a specified occasion, is not provable by evidence of his specific acts or course of conduct." Id.
Based on the foregoing, the trial court reversibly erred in admitting the testimony of the two "impeachment" witnesses. We reverse the judgment of the Court of Criminal Appeals and remand for that court to order a new trial. Because of our holding, we need not consider other alleged errors.
REVERSED AND REMANDED.
HORNSBY, C.J., and MADDOX, ALMON, SHORES, ADAMS, HOUSTON and KENNEDY, JJ., concur.
INGRAM, J., dissents.
INGRAM, Justice (dissenting).
Because I believe that the testimony was properly admitted for purposes of impeaching Lacy's credibility, which came into question when he testified as a witness for himself, I respectfully dissent.
The record shows that the assailant entered the house where the victim was staying by cutting away a screen on an open window and climbing through. The State argued that Lacy, who had worked as a census taker, had seen the victim playing outside while Lacy was working the area and that Lacy had returned during the night, entered the house, and attacked the victim.
Lacy, the only defense witness, contended that the charges against him were "politically motivated" because of his community activism. He testified that he had not attacked the victim and that he had not hidden in the bushes or entered the house through the window. He also stated that he did not look into people's windows, because, he said, he had no reason to.
The State presented two witnesses, Uecker and Davidson, who testified that Lacy had hidden in bushes around their houses and had looked into their windows. The trial court, in response to Lacy's objection to the testimony, stated:
"I see a relationship, though, between the conduct that they're talking about and the conduct in this case, and there certainly is a very clear contradiction between his testimony on cross-examination and what I'm told this witness is going to testify to."
Before the witnesses testified, the trial court gave the following limiting instruction:
"THE COURT: Ladies and gentlemen of the jury, let me say something to you at the outset. I have not talked to this lady and do not know exactly what her testimony will be except that there have been representations made to me by counsel for the State as to the tenor of her testimony. I tell you in advance that this testimony *955 that this lady gives is admissible in this trial for one reason and one reason only, that is as to the credibility that you choose to give to the testimony of the defendant.
"This evidence about an event allegedly that this lady is going to testify about is not in issue in this case at all. We're trying the issue of whether the defendant is the person involved in the activities that you have heard testimony about that occurred on the night of June 3 and/or the early morning hours of June 4, 1990. Do all of you understand that to be the issue in this case?
"(The jurors either answered verbally, yes, or nodded their heads.)
"THE COURT: If any of you are confused, raise your hands.
"(No hands were raised.)
"THE COURT: All right. Now, this is about other activities, and we're not here to try those other activities. This testimony is admissible for one purpose and one purpose only, and that is, if believed by you, to be used by you to compare to the testimony of other witnesses, to-wit: the defendant himself, to decide the credibility or believability that you choose to give to the testimony and then the weight that you would give to that testimony. Do all of you understand that?
"(The jurors either answered verbally, yes, or nodded their heads.)
"THE COURT: Are any of you confused by what I have just said? If you are, raise your hand and I will try to explain better.
"(No hands were raised.)
"THE COURT: All right. Do all of you assure me that this is the only consideration that you will give to this testimony?
"(The jurors either answered verbally, yes, or nodded their heads.)
"THE COURT: If you do, raise your hands.
"Let the record reflect that all fourteen hands have been raised.
"THE COURT: All right. Mr. Lampley's objection is overruled with that understanding, that this evidence is admissible for a limited purpose only."
I believe that the trial court properly exercised its wide discretion in allowing the State to admit Uecker's and Davidson's testimony for the limited purpose of impeaching Lacy's credibility as a witness for himself. I believe that Lacy's conviction should be affirmed; therefore, I respectfully dissent.
NOTES
[1] Evidence is said to be "material" where the purpose it is offered for "is of consequence to the determination of the action." McElroy's at § 20.01, quoting, Fed.R.Evid. 401.
[2] Because testimony that Lacy had tapped on or looked in the windows of others did not tend to identify him as the intruderthere being no evidence associating the intruder with such acts we do not make a detailed analysis of the state's contention that the testimony would have been otherwise admissible on the question of "identity."